**John ADKINS, Jr., Petitioner,**

v.

**BOARD OF OIL, GAS & MINING and Union Pacific Resources Company, Respondents.**

No. 950219.

Supreme Court of Utah.

Nov. 5, 1996.

Dale A. Kimball, Scott R. Ryther, Terry E. Welch, Salt Lake City, for Adkins.

Jan Graham, Atty. Gen., Thomas A. Mitchell, Patrick J. O'Hara, Asst. Attys. Gen., Salt Lake City, for the Board.

H. Michael Keller, Thomas W. Clawson, Salt Lake City, for Union Pacific Resources.

HOWE, Justice:

Petitioner John Adkins seeks review of the dismissal of his request for agency action by the Board of Oil, Gas, and Mining for his failure to state a claim upon which relief may be granted and his failure to provide proper notice to all interested parties. The request

sought retroactive modification of an oil field spacing order, a forced pooling of interests with respondent Union Pacific Resource Company (UPRC), and a proportional share of UPRC's past and future production profits.

## I.  STANDARD OF REVIEW

■■■ Under Utah Code Ann. § 63–46b–16, dealing with judicial review of an agency's formal adjudicative proceedings,[1] we treat the Board's dismissal of Adkins' petition as analogous to a court's dismissal of a complaint pursuant to a rule 12(b)(6), Utah Rules of Civil Procedure, motion for failure to state a claim.  Therefore, we grant "no particular deference" to the Board's legal conclusions. *Bennion v. Graham Resources, Inc.,* 849 P.2d 569, 570 (Utah 1993).  In addition, "[w]e accept the factual allegations in the complaint as true and consider them and all reasonable inferences to be drawn from them in the light most favorable to the [petitioner]." *St. Benedict's Dev. v. St. Benedict's Hosp.,* 811 P.2d 194, 196 (Utah 1991).

## II.  FACTS

### General Background

■■ The Utah Oil and Gas Conservation Act, Utah Code Ann. § 40–6–6, authorizes the Board of Oil, Gas and Mining to issue "spacing orders" which divide oil and gas fields into "drilling units," each typically allowing one well per unit for maximally efficient recovery of mineral resources.  "All lands determined by the Board to overlay the pool" must be included in a drilling unit. § 40–6–6(5)(b).  The Board determines the size and shape of the drilling units on the basis of various geologic and engineering factors. § 40–6–6(4), (5).  The Act provides protection for "correlative rights," § 40–6–1, defined as "the opportunity of each owner in a pool to produce his just and equitable share of oil and gas in a pool without waste." § 40–6–2(2).  It also minimizes unnecessary wells by providing that the "drilling unit may not

be smaller than the maximum area that can be efficiently and economically drained by one well." § 40–6–6(3).  The Board has the power to modify existing spacing orders. § 40–6–6(6).  Landowners within a drilling unit may elect to pool their interests, or if they do not, the Board may force a pooling of interests so that all owners within the unit will share in the costs and rewards of resource production. § 40–6–6.5(2)(a).  It logically follows from the above statutes that no landowner has any claim on production from drilling units other than those upon which his land is situated.

### Relevant Specific Facts

Adkins owns 40 acres on the northeast edge of the Pineview oil field, which is part of the Nugget formation in Summit County, Utah.  He has owned the land continuously during all relevant time periods.  The land was under lease to Amoco Production Company from 1975 to 1981 and to Wells Petroleum from May 1982 to May 1985.  Both leases expired for lack of production.  In 1975, Quasar Petroleum petitioned for a temporary order, which the Board granted, dividing the Pineview field into 160–acre drilling units.  In 1976, however, UPRC's predecessor in interest, Champlain Petroleum Company, petitioned for a reduction of the unit size to 80 acres, contending that this was the largest area which could be effectively drained by one well and that the smaller drilling units would provide necessary flexibility of well sites, protect Champlain's correlative rights, and avoid the possibility of drilling dry holes.  The Board granted the petition and issued a temporary spacing order over the objections of other oil company witnesses who protested that the application was premature and not sufficiently supported by production and engineering data.  This reduction placed Adkins' 40 acres and an adjoining 40 acres together in a drilling unit where no well had been drilled.  Adkins was personally served with notice of the 1976 hearing but did not participate.  Although he had the opportunity to appeal the Board's ruling, he did not do

---

**1.** Utah Code Ann. § 63–46b–16(4)(d) provides, "The appellate court shall grant relief only if, on the basis of the agency's record, it determines that a person seeking judicial review has been substantially prejudiced by any of the following ... (d) the agency has erroneously interpreted or applied the law."

so. In 1976, Champlain completed the Bingham 1–42–3 well in an 80–acre drilling unit which is two units directly south of Adkins' unit. That well, now owned by UPRC, has been consistently productive from that time to the present, yielding to date over 3 million barrels of oil.

The Nugget formation has produced under a fairly strong water drive in which water encroaches upon the edges of the field as the oil is withdrawn. Consequently, the oil initially in place under Adkins' land has migrated south out of his drilling unit toward the Bingham well. The well site for the drilling unit which encompasses Adkins' land is situated on his property, but a well has never been drilled. He asserts that drilling a well on his property is unnecessary and would be wasteful since the oil beneath his land has migrated and was and is being produced by UPRC's Bingham well. Moreover, it would be entirely futile at this point since Adkins' land no longer overlays any oil. Adkins has received no benefit from the oil formerly underlying his land. This situation gave rise to Adkins' request for agency action.

Adkins sought a modification of the drilling unit size to 200 acres so as to include his 40 acres with 160 acres of UPRC's land in a new unit encompassing the Bingham well. Although the Oil and Gas Act specifies that absent unusual circumstances, drilling units should be regular, § 40–6–6(4)(a), Adkins proposed an irregularly sized drilling unit which would include his 40 acres but exclude the other 40 acres in his present drilling unit. He also sought to have the new spacing order applied retroactively to the beginning of production from the Bingham well in 1976, allowing him a proportional share of past, as well as future, profits.

Following Adkins' request for agency action, UPRC moved to dismiss for failure to state a claim on which relief may be granted under section 63–46b–1(4)(b). UPRC asserted that Adkins could prove no set of facts upon which relief could be granted and also that Adkins had failed to comply with Utah Administrative Code requirements for notice to all interested parties because he did not notify the co-tenant on his current 80–acre drilling unit of his request for agency action.

Although the co-tenant's land was not to be included in the proposed new unit, UPRC asserted that the co-tenant was an interested party since he would have no approved well site within his own 40 acres if Adkins' land was placed in another drilling unit. The Board granted UPRC's motion, concluding that Adkins had not alleged (1) any interest or correlative rights in the Bingham well drilling unit which would support a claim to production proceeds from that well, (2) any factual basis or legal authority to justify retroactive modification of a spacing order, (3) sufficient new information to support modification of the order, or (4) geologic, topographic, or other evidence to support creation of a non-uniform drilling unit, and furthermore had not provided notice to all persons with a direct interest.

Adkins seeks review of the dismissal of his petition, contending that the Board erred when it failed to grant him an evidentiary hearing on his request and that the Board did not construe the allegations of his request in the light most favorable to him.

## III. ANALYSIS

■ Section 40–6–1 states the purposes of the Oil and Gas Act, which include the development and utilization of natural resources, full protection of the correlative rights of all owners, and the prevention of waste. Section 40–6–2(2) defines correlative rights as "the *opportunity* of each owner in a pool to produce his just and equitable share of the oil and gas in the pool without waste" (emphasis added). The utilization of the opportunity depends upon the individual landowner. In dismissing Adkins' petition, the Board correctly observed in its order:

The protection provided to a landowner's correlative rights in the oil and gas reserves beneath his land under a spacing order is the right to drill within the legal location of the spacing unit. It does not provide a guarantee that no oil can ever be drained from beneath his land, [or] that his well will be successful, [or] that failure to exercise his right will result in no future loss of resources.

Adkins' land contains an approved well site in his present drilling unit, yet he has not attempted to drill a well. If, as he asserts, it would have been wasteful and futile to drill on his land, he had the right at all times since 1976, before the oil escaped, to petition the Board for a modification of the 80–acre drilling unit in which he was placed. He did not do so, and now the oil under his land has been drained. Under the Act, as in many areas of law, a legal right can evaporate through delay.

Traditionally, statutes of limitation define the time period within which an action must be brought, thus according a measure of stability to settled transactions and expectations. "[S]tatutes of limitation are intended to compel the exercise of a right of action within a reasonable time ...." *Horton v. Goldminer's Daughter*, 785 P.2d 1087, 1091 (Utah 1989). Although here we find no formal statute of limitation, "relief in equity may yet be denied on the ground of a plaintiff's laches even where a statute of limitation is not a bar." *American Tierra Corp. v. City of W. Jordan*, 840 P.2d 757, 763 (Utah 1992); *see also Renn v. Utah State Bd. of Pardons*, 904 P.2d 677, 684 (Utah 1995) (equitable doctrine of laches available to dismiss untimely writs). Adkins' eighteen years of inaction have allowed the sands in his geologic hourglass to run out. For eighteen years, the other parties involved have relied upon the standing spacing order, with no challenge from Adkins. The right protected by the Act "initially is nothing more than an 'opportunity' to produce a 'just and equitable' share of oil and gas 'without waste.'" *Cowling v. Board of Oil, Gas & Mining*, 830 P.2d 220, 225 (Utah 1991). We held in *Cowling* that "[a]n owner's failure to take action to establish and protect his or her interest in production prior to the entry of a spacing order constitutes a waiver of that interest until a drilling unit is established." *Id.* at 228. It logically follows that an owner's failure to take action upon an approved well site within a designated drilling unit until after the oil has all escaped constitutes a waiver of his interest. If Adkins had been obstructed in his request for agency action or had been the victim of fraud or inequitable conduct, then the Board could possibly reach back into the past. *Id.* at 228, 229. Here, however, where the inaction was wholly voluntary, we can find no justification under the Act to do so, regardless of how persuasive Adkins' arguments, timely asserted, might have been.

We affirm the dismissal of Adkins' petition.

ZIMMERMAN, C.J., STEWART, Associate C.J., and DURHAM, and RUSSON, JJ., concur.